E-FILED
Friday, 01 February, 2013  04:06:47 PM
Clerk, U.S. District Court, ILCD

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| U.S. COMMODITY FUTURES TRADING COMMISSION, | ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 11-1436 |
| | ) | |
| SUMMIT TRADING & CAPITAL, INC., a dissolved Illinois Limited Liability Company, BRANT L. RUSHTON, an individual, and MELISSA C. RUSHTON, an individual, | ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

## O P I N I O N

This matter is now before the Court on Plaintiff, U.S. Commodity Futures Trading Commission's ("CFTC") Motion for Summary Judgment. The Motion is fully briefed. For the reasons set forth below, Plaintiff's Motion for Summary Judgment [23] is GRANTED.

### Background

Defendant Summit Trading & Capital, LLC, ("Summit") was an Illinois Limited Liability Company formed on January 12, 2007, with its last principal place of business listed as 2755 N.W. Champion Circle, Bend, Oregon, 97701. Defendants Brant and Melissa Rushton were the sole Managers of Summit. Although Melissa signed the incorporation documents as a manager, she has subsequently denied knowing that she was signing in that capacity at that time. Summit's January 15, 2007, Operating Agreement was signed by Brant and Melissa and provides that the business "shall be managed exclusively by the Managers" who are responsible for "all decisions relating to

the management and control of the conduct of the business of the Company." Summit was involuntarily dissolved by the Secretary of State on July 9, 2010.

From June 2005 through November 2011, Brant solicited members of the general public to invest in one or more commodity pools to be operated by Summit in exchange for a pro rata share of the profits. While some solicitations were oral, Brant also disseminated written prospectuses claiming that one pool had earned a 86.98% net return since 2007 with positive gains in every quarter, another pool had earned profits between 46 and 92% since 2006 with an average of 11 profitable months per year, and yet another pool had earned a 181.5% net return since 2004 with no down quarters. At least one investor was also told by Brant that up to $50,000 of her first investment would be guaranteed by Summit against risk of loss. These representations were false.

Relying on these false representations, at least 16 investors provided Summit a total of at least $1,990,568 for investment in the pools. Rather than opening futures accounts in the names of the purported pools, Brant opened a single futures trading account in his and Melissa's names at Velocity Futures, LP, a registered domestic Futures Commission Merchant ("FCM") in December 2005. Neither Brant nor Melissa ever opened a futures trading account at any domestic FCM in the name of Summit or any of the purported pools during the relevant period. Between December 2005 and September 2011, 45 deposits were made into the Velocity account with funds that originated from bank accounts held in the names of Brant, Brant and Melissa, or Summit at three different banks. During this time, trading on the Velocity account resulted in cumulative net losses of approximately $403,545.00, and monthly profit never was higher than $2,275.74. During this same time, 275 withdrawals were initiated from the Velocity account ranging from $100 to $60,200, and

the funds were transferred to bank accounts held in the name of Brant individually or Brant and Melissa jointly at four different banks.

Monthly statements were distributed to the investors.  Almost all of these statements reported false profits purportedly earned in the investors' accounts as a result of the alleged trading and overstated the balance in each investor's account.  Investors also received IRS 1099 forms showing annual profits purportedly earned by them when in fact, actual trading resulted in net losses.

In early 2010, Melissa became aware that Summit was not performing as well as she previously thought, that there were "problems with the accounts," that there "might have been mistakes made on the [account] statements" sent to investor Jonusas, and that Jonusas was having problems withdrawing his funds from Summit.  Also in early 2010, Melissa had conversations with Brant about potential inaccuracies in account statements sent to investor Kagel.  At about this time, Brant and Melissa undertook a lifestyle change by "cutting back to make sure we could get everything right and that we were doing everything correctly."  This change included pawning personal property and the sale of one of their automobiles.

Between February 2010 and April 2011, Summit received an additional $373,000 from investors, including $200,000 from Melissa's friend, Diane van den Berg.  Despite the concerns previously raised regarding Summit's performance and the investments of Jonusas and Kagel, Melissa never had a discussion with Brant about whether it was a good idea for her friend to invest with Summit.

In March 2011, Kagel attempted to redeem a portion of his account with Summit.  After not receiving his funds for several weeks, he called Brant, who claimed that the payment had been sent.  No payment was ever received.  In late April 2011, Brant and Melissa had another discussion about

3

inaccuracies in account statements sent to Kagel. On May 3, 2011, Kagel, Brant, and Melissa all participated in a phone call during which Kagel expressed concerns about his account with Summit. During this call, Brant told Kagel that only approximately $70,000 of all the investors' funds remained. When Kagel questioned them about the account statements that he had received, Brant admitted that Kagel's account was never worth the amount represented and that the account statements had contained false information. Knowing that Kagel had requested, but not received his funds from Summit, Melissa contacted her parents for money to help try to resolve the situation. Melissa had no conversations with any other investors.

On June 21, 2011, van den Berg sent an email to Melissa, expressing her frustration with the tardiness of profit checks and statements, as well as concerns about Brant's lack of response to her request to close her accounts with Summit. Melissa never responded to the email and did not discuss it with her at subsequent interactions between the two of them.

On July 6, 2011, investors Kagel and Linhart received a letter from an attorney representing Brant and Summit that proposed a settlement of these investors' claims regarding the balance of their investments. The letter proposed that Brant and Summit would issue the investors amended IRS Form 1099s reflecting losses rather than the profits previously reported, and would return approximately $25,000 and $107,000 respectively to be paid in 60 monthly installments. Neither investor accepted the offer. Melissa understood at the time that the purpose of the settlement offer was to "help the process of resolving whatever was going on with Todd Kagel" in light of the fact that "something was wrong and that [Brant] needed to fix it." Linhart lost all but $153,000 of his $418,000 investment, while Kagel lost his entire investment of more than $380,000.

4

In July 2011, Brant offered to reimburse van den Berg her entire investment plus an additional $50,000 in interest by making payments of between $2,000 and $92,000 over the next 15 months.  Brant admitted to van den Berg that "he had lost all the money" and that the account statements and 1099s received contained false information.  In the end, van den Berg received approximately $13,000 of her $200,00 investment.

On September 19, 2011, the Velocity trading account was closed, and the remaining $4,797.02 was transferred to a bank account in the names of Brant and Melissa.  On Ceptember 20, 2011, Brant attempted to open new trading accounts at a different FCM, but his application was denied.  On September 21, 2011, Brant opened a trading account in his and Melissa's names at Open E Cry, LLC ("OEC"), and made three deposits between October and November 2011 with funds that originated from at least one bank account held in the names of Brant and Melissa.  During this time, an additional $70,000 was accepted from investors and trading resulted in a cumulative net loss of $1,795.

In sum, of the $1,990,568 received by Defendants from investors for trading in the pools, approximately $405,340 was lost in trading (including broker commissions and fees), approximately $363,811 was returned to investors, approximately $39,824 is frozen pursuant to a Statutory Restraining Order, and the remaining $1,181,593, including funds deposited in or transferred to bank accounts owned or controlled by Summit, Brant, and/or Melissa, has not been returned to investors. Most if not all of these remaining funds was used to pay personal expenses or for other illegitimate purposes.

Despite the fact that she signed the incorporation documents as a manager and was registered with the Secretary of State as a manager of Summit, Melissa contends that she was unaware of this

fact until the date of her deposition.  According to her, she signed Summit's operating agreement so that, in the event of Brant's death, she would have the control needed to dissolve the company. Brant conducted all of the trading.  Melissa claims that she had no defined roles or responsibilities in the operation of Summit and does not recall conducting any bank transactions, with the possible exception of dropping checks off at the bank at Brant's request.  She asserts that she did not handle any paperwork,  such as preparing tax returns or maintaining business files; she did not solicit or accept money from investors.  Melissa maintains that Brant maintained all of Summit's corporate books and records without her assistance; she did not prepare or review account statements, but assumed that Brant distributed them regularly to investors.  She was aware that funds were wired into a personal bank account but purportedly believed these funds were trading profits or commissions made by Brant. If she wrote a personal check to Summit, she states that she did it only at Brant's request without questioning why.

On July 12, 2012, Brant entered a blind guilty plea to Counts 1 and 4 of an indictment issued on March 12, 2012, which alleged that Brant, in connection with his operation of Summit, fraudulently solicited investors to invest in commodity pools, misappropriated investor funds, and issued false account statements to investors.  The CFTC brought this action alleging various violations of the Commodity Exchange Act and Commission Regulations, seeking injunctive relief, future trading bans, restitution for investor losses, and civil monetary penalties.  A preliminary injunction was previously entered by agreement.  The CFTC has moved for summary judgment, and this Order follows.

## LEGAL STANDARD

Summary judgment should be granted where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56. In ruling on a motion for summary judgment, the Court must view the evidence on record in the light most favorable to the non-moving party. *SMS Demag Aktiengesellschaft v. Material Sciences Corp.*, 565 F.3d 365, 368 (7th Cir. 2009). All inferences reasonably drawn from the facts must be construed in favor of the non-movant. However, any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Cain v. Lane*, 857 F.2d 1139, 1142 (7th Cir. 1988); *Smith v. Hope School*, 560 F.3d 694, 699 (7th Cir. 2009).

It is not the Court's function to scour the record in search of evidence to defeat a motion for summary judgment. The moving party has the responsibility of identifying portions of the record or affidavits that demonstrate the absence of a triable issue. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party may meet its burden of showing an absence of disputed material facts by demonstrating "that there is an absence of evidence to support the non-moving party's case." *Id.* at 325. If the evidence on record could not lead a reasonable jury to find for the non-moving party, then no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *McClendon v. Indiana Sugars, Inc.*, 108 F.3d 789, 796 (7th Cir. 1997). At the summary judgment stage, however, the "court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts." *Washington v. Haupert*, 481 F.3d 543, 550 (7th Cir. 2007).

Initially, the Court notes that Brant failed to respond to the CFTC's Request for Admissions, and the requests are thereby admitted. Brant also pled guilty to an indictment alleging essentially the same conduct as that alleged in Counts I, II, and V of the Complaint. The Court further notes that only Melissa filed a response to the pending Motion for Summary Judgment. Brant and Summit (based on Brant's actions/omissions as its agent) are therefore deemed to have conceded the merits of the Motion, and summary judgment is granted against them in favor of the CFTC on all counts of the Complaint. This leaves the question of Melissa's liability.

The CFTC brought this enforcement proceeding to enjoin violations of the Commodity Exchange Act ("CEA") 7 U.S.C. § 1 et seq. In Counts I and II of its complaint, CFTC alleges violations of the following subsections of CEA § 4b:

> It shall be unlawful – (1) for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity in interstate commerce or for future delivery that is made, or to be made, on or subject to the rules of a designated contract market for or on behalf of any other person; or (2) for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery, or other agreement, contract, or transaction subject to paragraphs (1) and (2) of section 7a(g) of this title, that is made, or to be made, for or on behalf of, or with, any other person, other than on or subject to the rules of a designated contract market – (A) to cheat or defraud or attempt to cheat or defraud such other person; (B) willfully to make or cause to be made to the other person any false report or statement or willfully to enter or cause to be entered for the other person any false record; (C) willfully to deceive or attempt to deceive the other person by any means whatsoever in regard to any order or contract or the disposition or execution of any order or contract, or in regard to any act of agency performed, with respect to any order or contract for or, in the case of paragraph (2), with the other person . . . .

7 U.S.C. § 6b(a). Among allegations in Counts I and II, the CFTC contends that Defendants misrepresented to commodity investors that their funds were invested in a successful commodity

pool and issued statements which falsely reported that investors' accounts were increasing in value when they were actually decreasing.

To establish that Melissa violated Section 4b(a)(1) of the Act, the CFTC must prove that: (1) a misrepresentation, misleading statement, or deceptive omission was made; (2) with scienter; and (3) that the misrepresentation, misleading statement, or deceptive omission was material. Actions that could be evidence of a violation of this section could include such things as delivering false statements to investors, diverting investor funds for personal use, soliciting funds for trading and then using the funds for another purpose, etc.

While it is admitted that Brant engaged in conduct constituting a violation of the Act, Melissa's scope of knowledge and conduct is disputed; the evidence could be interpreted to support several competing inferences. The same is true of the alleged violations of §§ 4o(1)(A) and (B) of the Act, which prohibit using the mail or any means of interstate commerce to defraud an investor, Regulation 4.20 prohibiting illegal receipt and commingling of funds, the registration requirements of §§ 4m(1) and 4k(2), and control person liability under § 13(b) of the Act. Accordingly, the Court finds that there are genuine issues of material fact with respect to Melissa's liability under the Complaint that require assessments of credibility and determination by a finder of fact. The CFTC's Motion for Summary Judgment is therefore denied in this regard, and this portion of the matter will move forward to final pretrial conference.

## CONCLUSION

For the reasons set forth above, the CFTC's Motion for Summary Judgment [23] is GRANTED IN PART AND DENIED IN PART. The Motion is granted as it pertains to

Defendants Brant Rushton and Summit, and denied as it pertains to Defendant Melissa Rushton.

What remains of this matter is now ready for final pretrial conference.

ENTERED this 31st day of January, 2013.

s/ James E. Shadid_____
James E. Shadid
Chief United States District Judge